**HOLLY HILL LUMBER COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 10443.

United States Court of Appeals Fourth Circuit.

Argued June 2, 1966.

Decided June 23, 1967.

Knox L. Haynsworth, Jr., Greenville, S. C. (Thompson, Ogletree & Haynsworth, Greenville, S. C., on brief), for petitioner.

Marcus W. Sisk, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Glen M. Bendixsen and Joseph C. Thackery, Attys., N. L. R. B., on brief), for respondent.

Before BOREMAN, BRYAN and J. SPENCER BELL,* Circuit Judges.

BOREMAN, Circuit Judge:

Holly Hill Lumber Company (hereafter company) asks this court to set aside an order of the National Labor Relations Board (hereafter Board) which directed the company to cease and desist from unfair labor practices in violation of section 8(a) (1) of the Act. 29 U.S.C. § 158(a) (1). Affirmatively, the company was directed to post appropriate notices. Also the company seeks review of the Board's order, entered in the same proceeding, which set aside a representation election won by the company and directed a second election.

The company operates a large sawmill and maintains 60,000 acres of timberland near Holly Hill, South Carolina. At the time of the events in question it had 211 employees. In the summer of 1964 the International Woodworkers of America, AFL–CIO, (hereafter union) began to assist certain of these employees in their union membership drive. The section 8(a) (1) violations are alleged to have occurred in the course of this campaign. On December 17, 1964, an election was held and by a vote of 134 to 75 the employees rejected the union as their bargaining representative.

The union filed timely objections to the results of the election, alleging that

---

\* Judge Bell participated in the hearing and concurred in the disposition of the case but died before the opinion was prepared.

various incidents, later discussed, prevented the employees from exercising a free choice. The Regional Director, without a hearing, held that one particular incident, involving a company official's use of a gun, was sufficient to set aside the election. The company appealed to the Board for review. The Board held that the gun incident raised substantial and material issues of fact and directed that a hearing be held to investigate the union's objections as to the gun incident and as to other instances of alleged interference, restraint and coercion. The Board further ordered that the hearing be consolidated with a hearing on the union's charges of unfair labor practices which had been filed.

Such hearing was held in June 1965. The Trial Examiner, whose decision was adopted by the Board, found that the company had violated section 8(a) (1) by interfering with, restraining and coercing employees in the exercise of their protected rights. Several of the union's objections to the election were sustained and the Board remanded the matter to the Regional Director to set aside the election and to hold a new election.

■ An analysis of the Board's order setting aside the election and directing a new election reveals that the company has not been ordered to do anything nor to refrain from doing anything. Congress has only given the courts of appeals jurisdiction to review final orders of the Board in unfair labor practice matters. Section 10(f) of the Act, 29 U.S.C. § 160(f), is concerned only with review of unfair labor practices, and section 9(d), 29 U.S.C. § 159(d), merely provides that when review is sought in an unfair labor practice case based upon Board certification in a representation proceeding the record in the representation case shall be included in the record in the unfair labor practice case, N. L. R. B. v. Falk Corp., 308 U.S. 453, 459, 60 S.Ct. 307, 84 L.Ed. 396 (1940);

AFL v. N. L. R. B., 308 U.S. 401, 406, 409, 60 S.Ct. 300, 84 L.Ed. 347 (1940).

In Daniel Construction Co. v. N. L. R. B., 341 F.2d 805, cert. denied, 382 U.S. 831, 86 S.Ct. 70, 15 L.Ed.2d 75 (1965), this court considered the identical question presented here. The Board, having found that the company had violated section 8(a) (1) during the course of an election campaign and that such conduct had interfered with the employees' free choice, set the election aside, and ordered that a new election be held. The company sought review of both matters in this court. We dismissed that portion of the appeal concerning the representation proceeding, holding that there was no jurisdiction in the courts of appeals to review that part of the case. 341 F.2d at 809. We there held that the company could only challenge the Board order if in the second election the union is victorious, is certified by the Board, the company refuses to bargain, and the Board in a subsequent unfair labor practice proceeding finds that the company violated section 8(a) (5) of the Act by refusing to bargain collectively. 341 F.2d 810. Accordingly, we dismiss the company's appeal on this question because of lack of jurisdiction. Of course, the company is free to again raise this question on appeal if the events discussed above occur. See Boire v. Greyhound Corp., 376 U.S. 473, 477, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); Greensboro Hosiery Mills, Inc. v. Johnston, Regional Director, 377 F.2d 28 (4 Cir. May 2, 1967).

We turn to an examination of the Board's findings that the company violated section 8(a) (1) of the Act. At the outset it is noted that the Trial Examiner found that the employees who testified were honest and trustworthy despite the fact that they were uneducated and rather inarticulate.

## THREATS

The Trial Examiner found that Superintendent Flowers, in the course of

interrogating employee James Tennant about his knowledge of union activity, made the remark that if he felt Tennant were lying he did not know what he would do. This discussion took place in Flowers' office. In October Flowers told employee Heyward that, despite anything the union said, he was the boss and would hire and fire as he pleased.

Vice-president Colvin was found to have stated to Heyward that he had been operating the plant for thirty years without a union and that he would close the plant before recognizing a union. On this occasion Heyward had gone to Colvin's office to see him about borrowing money.

 We have held that remarks made within the context of an organizing campaign to the effect that employer would close the plant if the union got in were violations of section 8(a)(1). Florence Printing Co. v. N. L. R. B., 333 F.2d 289, 290–291 (4 Cir. 1964). Threats of discharge or of other discrimination because of union membership have also been held to be violative of section 8(a)(1). N. L. R. B. v. McCormick Concrete Company of S. C., Inc., 371 F.2d 149, 152 (4 Cir. 1967); N. L. R. B. v. Associated Naval Architects, Inc., 355 F.2d 788, 791 (4 Cir. 1966).

 The company argues that section 8(c) which permits the statement of any views, argument, or opinion, if it contains no threat of reprisal or force or promise of benefit, protects the statements made in this case. We agree that the employer is free to make any statement of opinion concerning the union which contains no threats or promise of benefit. See N. L. R. B. v. Threads, Inc., 308 F.2d 1, 9 (4 Cir. 1962). However, the remarks in this case go beyond the protection afforded by section 8(c). Colvin told Heyward he would close the plant before recognizing the union. This amounts to more than a statement of opinion or colorless prophecy. It cannot be argued seriously that Flowers' statement to Tennant was a mere expression of opinion since, under the circumstances and in the context of an organizing campaign, it seemed calculated to place Tennant in fear of discharge for union activity.

### INTERROGATIONS

The Trial Examiner found that Superintendent Flowers had spoken to employee James Tennant on several occasions. Tennant was asked if he contacted the union, signed a card, or had gone to a union meeting. He admitted attending a meeting and Flowers asked him what had been said here. On another occasion Flowers asked him if he were active in securing employee support for the union and reminded him that they were good friends. Several days later while in Flowers' office Tennant was told that he was "with" the union.

In September Flowers asked employee Lincoln if he had gone to a union meeting, and when Lincoln replied in the affirmative Flowers asked what had gone on. Lincoln stated that he did not remember. On another occasion in November, Flowers asked Lincoln if he was soliciting employee signatures on authorization cards. Lincoln again was evasive, saying he did not know what Flowers meant, and Flowers said "you do so," and walked away.

In October Flowers asked employee Martino if he had gone to a union meeting. Martino said he had but that he did not remember what took place.

In September Flowers also spoke with employee Heyward about a strike in nearby Orangeburg. Flowers told him that the strike had been unsuccessful and that the employees were forced to return to work at pre-strike wages.

In October a foreman, Ed Boyd, asked employee Robert Taylor, while the men were in Boyd's truck, what he thought about the union. Taylor stated that he had previously been a union member in Charleston, South Carolina. Finally, it

was found that in late October Vice-president Colvin had asked Taylor to come to his office. He asked Taylor about employee interest in the union. Taylor stated that he was unaware of this and Colvin replied that he did not care to have the union.

■ The company argues that these interrogations which often involved close friends were not per se violations of the Act. We agree that interrogation is not per se unlawful. The legality of the interrogation is to be determined by examining and considering the entire context in which it took place. In *Daniel Construction Co.*, supra, 341 F.2d 805, it was stated that the fact that interrogations were made by close friends of the employees who permitted them to argue the union side may be consistent with a finding that no coercion existed. But it was also pointed out that these facts did not destroy the inference of coercion which the Board could draw, considering the other unfair labor practices which took place. 341 F.2d at 812.

In N. L. R. B. v. Associated Naval Architects, Inc., supra, 355 F.2d 788, persistent interrogation of employees to elicit information as to what happened at union meetings and the identity of active pro-union employees was held to be violative of section 8(a) (1). Id. at 791. And in N. L. R. B. v. McCormick Concrete Co., supra, 371 F.2d 149, 151, we pointed out that interrogations made without assurances that there would be no reprisals was a factor to be considered in determining whether certain statements violated section 8(a) (1).

■ In the instant case the interrogations as to whether employees had attended union meetings and as to what took place were unaccompanied by any assurances there would be no reprisals. In two instances involving Heyward and Tennant, these questions were accompanied by threats of economic retaliation and discharge. In this context we conclude that the Board's decision that such conduct violated section 8(a) (1) is supported by substantial evidence.

## COERCION

■ The Trial Examiner found that Vice-president Miller, by directing two employees to the office at gun point on the day of the election, had coerced employees in violation of section 8(a) (1). On November 26 the company terminated its nightshift consisting of some twenty-six employees. The election was to be held on the company premises on December 17. On December 16 the company sent telegrams to ten laid-off employees, stating that although they were considered as permanently laid off, they would be allowed to vote in the election and were directed to report to the Board agent.

The Trial Examiner further found that on December 17 Heyward, Lincoln and Martino, who had been discharged prior to the layoff of the nightshift, drove to the plant in Jerry V. Boyd's car in order to vote. Boyd was then an employee of the company. As they passed the main office building Colvin noticed the car and asked Miller, another vice-president, to investigate since he did not recognize the occupants. Miller drove down the road to where Boyd's car was parked. By this time Heyward had alighted from the vehicle. Miller asked the occupants of the car their names and their purposes. Each stated his name and that he came to vote. Miller then asked them if they worked there. Boyd replied that he did and Lincoln and Martino said they had been laid off. Miller ordered Lincoln and Martino to go to the plant office and refused to explain.

According to the testimony credited by the Trial Examiner, Miller returned to his truck. Martino and Lincoln did not go to the office but left Boyd's car and got into Joe Baxter's car. Baxter was a former employee who had been fired for stealing. When Miller saw that the men were not going to the office he took a pistol from the glove compartment of

his truck and walked to Baxter's car with the weapon under his coat. When he reached the car he again ordered Lincoln and Martino to the office. They asked him why that was necessary but he did not reply. Instead he opened the rear door of the car, drew and cocked his pistol and pointed it at Lincoln. Both men got out of the car and began to walk toward the office. On their way they met the company attorney and a union representative and the difficulty was clarified. Both Lincoln and Martino voted, although their ballots were challenged.

Miller, who claimed that neither Lincoln nor Martino responded to his questions, was discredited by the Trial Examiner. The Trial Examiner was of the opinion that in view of its invitations to laid-off employees and the fact that the election was about to begin, the treatment of the men as trespassers was incomprehensible. However, the company challenges this conclusion by emphasizing the fact that no telegrams were sent to Lincoln and Martino and that these men were not laid off but had been discharged. It is also pointed out there is a conflict in the record as to whether the men told Miller their names and their purposes. However, Miller admitted that at least Boyd told him the names of the other two. The Trial Examiner found that the men had told Miller their names, and their purpose in being on the premises, i. e., to vote. In view of the facts that the election was to begin momentarily, that these men had told Miller of their intention to vote and that they did in fact vote, we feel that the Trial Examiner's findings on conflicting evidence that the gun incident amounted to coercion in violation of section 8(a) (1) is supported by substantial evidence.

Enforcement of the order of the Board concerning the 8(a) (1) violations is granted. The company's appeal seeking review of the Board's action in setting aside the election and ordering a new election is dismissed for lack of jurisdiction.

Petition for review dismissed.